**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


David J. Widi

     v.                             Case No. 14-cv-160-SM
                                         Opinion No. 2020 DNH 206

United States et al.


**ORDER**

The United States, the last defendant in this action, has moved for summary judgment (Doc. No. 305) on plaintiff David J. Widi's remaining claims, which allege that officers at the Federal Bureau of Prisons subjected him to excessive force in violation of the Federal Torts Claims Act ("FTCA").  The United States contends that the use of force against Widi by prison officers was reasonable and thus legally justified under the New Hampshire law of battery (which controls Widi's FTCA claims). Additionally, it asserts that Widi's claims based on Bureau of Prisons ("BOP") supervisors' purported failures to train or supervise officers are precluded by the FTCA's discretionary function exception.  To date, Widi has not filed an objection to the United States's motion, despite being granted five filing extensions to do so.  Nor has he submitted evidence showing that BOP officers acted unreasonably or without justification during any of the use-of-force incidents of which he complains.

1

After viewing the undisputed evidence of record, which includes video footage, in the light most favorable to Widi, the court finds that no reasonable juror could conclude that the force used against Widi during each complained-of incident was unreasonable or unjustified under New Hampshire law. Accordingly, the court grants summary judgment in favor of the United States on all employee-conduct-based FTCA counts. Additionally, the court dismisses Widi's remaining supervisor liability claims, as the FTCA's discretionary function exception strips this court of jurisdiction to rule on such claims.

## I.   __Background__

The following summary draws from the United States's recent filings and Widi's responses thereto, rehearsing the facts therein "in the light most favorable to the nonmoving party (here, the plaintiff), consistent with record support," and giving them "the benefit of all reasonable inferences that those facts will bear."  See Noviello v. City of Bos., 398 F.3d 76, 82 (1st Cir. 2005) (citation omitted).  In light of the court's prior order dismissing most of Widi's claims under Rule 12(b), see Doc. No. 290, the court rehearses only those facts pertinent to the claims remaining against the United States for the allegedly excessive force used by BOP officers and the alleged failure to train such officers before such force was used. Since Widi – a pro se plaintiff – has submitted no testimonial

2

or documentary evidence to support his claims or oppose summary judgment, the following recounts the unverified allegations made in his amended complaint – giving them what little, if any, weight they are due at summary judgment – before summarizing the facts gleaned from the undisputed evidence of record.

### A.   BOP policies on use of force

This case arises from pleadings filed by Widi regarding the allegedly excessive use of force by BOP officers against him when he was an inmate at the Federal Correctional Institutions in Ray Brook, New York ("FCI Ray Brook") and then Berlin, New Hampshire ("FCI Berlin").  At the core of his remaining claims, Widi contends that the force used by BOP officers was excessive and tortious, and thus in violation of his statutory rights.

BOP regulations and program statements ("PS") authorize the use of force in certain situations.  28 C.F.R. § 552.20; see also PS 5566.06.  Under these policies and regulations, BOP staff may use force "when attempts to gain voluntary cooperation form the inmate have not been successful."  PS 5566.06 at 2; see also 28 C.F.R. § 552.22 ("Staff ordinarily shall first attempt to gain the inmate's voluntary cooperation before using force.").  In such cases, staff may use force "only as a last alternative after all other reasonable efforts to resolve a situation have failed," and "must use only that amount of force necessary to gain control of the inmate, to protect and ensure

3

the safety of inmates, staff, and others, to prevent serious property damage and to ensure institution security and good order." 28 C.F.R. § 552.20.

BOP regulations distinguish between two types of force officers may use to ensure prison order and security — immediate and calculated.  28 C.F.R. § 552.20; see also PS 5566.06, at 3. "Staff may immediately use force and/or apply restraints when [certain inmate behavior] constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order."  28 C.F.R. § 552.21(a).  "In an immediate use of force situation, staff may respond with or without the presence or direction of a supervisor."  PS 5566.06, at 4.  Calculated force occurs, by comparison, "in situations where an inmate is in an area that can be isolated (e.g., a locked cell . . .) and where there is no immediate, direct threat to the inmate or others."  28 C.F.R. § 552.21(b).  When there is time for the calculated use of force or application of restraints, staff must first determine if the situation can be resolved without resorting to force."  Id.  When "feasible," BOP policy further instructs prison staff to use "confrontation avoidance techniques . . . to avoid calculated use of force situations."  PS 5566.06 at 2.

BOP regulations and PS 5566.06 also provide guidance on the use of restraints.  Staff may "apply restraints (for example,

handcuffs) to the inmate who continues to resist after staff achieve physical control of that inmate, and may apply restraints to any inmate who is placed under control by the Use of Force Team Technique." 28 C.F.R. § 552.22(e). "Where immediate use of restraints is indicated, staff may temporarily apply such restraints to an inmate to prevent that inmate from hurting self, staff, or others, and/or to prevent serious property damage." Id. § 552.22(d). If "the inmate's behavior becomes increasingly aggressive and disruptive, staff must determine the type of progressive restraints to be used (hard restraints with or without waist chain or waist belt, four-point soft restraints with hard restraints used for securing the inmate to the bed, or four-point hard restraints)." PS 5566.06 at 11. "Restraints should remain on the inmate until self-control is regained," 28 C.F.R. § 552.22(f), as demonstrated, for example, by "a pattern of non-disruptive behavior over a period of time," PS 5566.06 at 11.

Finally, BOP policy requires documentation for each use of force. PS 5566.06 at 4-5. For all uses of force, BOP officers must submit written documentation that "reflect[s] the actions and responses of each staff member participating in the confrontation avoidance process." Id. BOP policy further requires that, for calculated uses of force, "[t]he entire process must be videotaped, including the introduction of all

staff participating in the confrontation avoidance process."
Id.

### B.   Claim 1: July 18, 2014 immediate use of force for refusal to comply with escort to the Special Housing Unit ("SHU")

Widi asserts that on at least seven occasions, BOP officers tortiously used excessive force against him or misapplied restraints, in violation of BOP policy and thus the FTCA.  The first of these incidents occurred on July 18, 2014, when BOP officers escorted Widi on his requested transfer to the SHU.

Widi alleges that, during the transfer, officers maliciously and sadistically subjected him to an immediate use of force by kicking him in the shin, pulling him by the arms while he was handcuffed, and pushing him to the floor for refusing to accept an allegedly hostile cell assignment.  Am. Compl. (Doc. No. 226) ¶¶ 203-04, 511-14.  Widi asserts that this use of force caused him pain to his knee, shoulders, and wrists, a large contusion on his leg, and lacerations to his ankle and foot.  Id.

In support of its motion, the United States has submitted BOP written memoranda and video footage documenting the immediate use of force against Widi.  Because the incident involved an immediate, as opposed to a calculated, use of force, the video footage comes from surveillance cameras recording traffic in the cell block but not sound.  Though Widi maintains

that he did not become violent or display signs of imminent
violence, the video shows that Widi initiated the incident by
attempting to pull away from escorting officers, stepping
sideways instead of forwards, planting his feet, and then
pushing back against his escorts.  July 18, 2014 Video Footage
(Doc. No. 305-14); see also McCoy July 18, 2014 Mem. (Doc. No.
305-15).[1]  In response, the escorting officers quickly placed
Widi on the ground and held him there until he ceased his
resistance.  July 18, 2014 Video Footage (Doc. No. 305-14); see
also Taylor July 18, 2014 Mem. (Doc. No. 305-2), July 18, 2014
Incident Report (Doc. No. 305-3); Bruce July 18, 2014 Mem. (Doc.
No. 305-7).  The officers then stood Widi up against a wall and
applied restraints.  July 18, 2014 Video Footage (Doc. No. 305-
14).  After the incident, Widi reported that he was "fine" and
declined medical examination.  See Malcolm July 18, 2014 Injury
Assessment (Doc. No. 305-11).

### C.   Claim 2: July 19, 2014 calculated use of force in response to obstruction in Widi's cell window

The day after BOP officers used immediate force against
Widi, BOP supervisors authorized a calculated use of force in
response to an obstruction in Widi's cell window.  Widi alleges

---

[1] At the time of Widi's incarceration, BOP Lt. Amanda McCoy
was known as Amanda Curren.  McCoy Decl. (Doc. No. 305-13, ¶ 1).
The United States's motion and its exhibits identify McCoy by
her former name.  The court refers to McCoy and her documents by
her current last name throughout this order.

that BOP supervisors did so to punish him for the (alleged) assault the previous day, and that an officer created a false incident report stating that Widi had covered his cell window to justify the force team's entry.  Am. Compl. (Doc. No. 226) ¶¶ 207-09.  He further alleges that, upon entering his cell, officers escorted him to a shower area, removed his clothing on video, handled him aggressively, and placed him in restraints, the sum of which allegedly caused pain, lacerations, contusions, abrasions, discomfort, embarrassment, claustrophobia, and mental anguish.  Id. ¶¶ 207-08.

The video footage confirms that, despite Widi's allegations to the contrary, an obstruction was present in his window.  See July 19, 2014 Video Footage #1 (Doc. No. 305-31).  According to one officer's incident report, Widi had earlier failed to comply with or respond to direct orders to remove the obstruction from the window.  Folnsbee July 19, 2014 Incident Report (Doc. No. 305-26).  The Warden reportedly "determined that inmate Widi could not be approached without danger to himself or others," and that "a delay in bringing the situation under control would constitute a serious hazard to the inmate and others."  See McCoy July 19, 2014 Mem. (Doc. No. 305-17).  A supervising lieutenant thus assembled a calculated use-of-force team comprised of herself and five armored officers.  Id.; see also See July 19, 2014 Video Footage #1 (Doc. No. 305-31)

8

(documenting the stated justification for the use, as well as
the force team members' individual duties, prior to executing
the use of force).

The video footage shows that, upon arrival, the force team
offered Widi a chance to remove the obstruction in his window
and "cuff up" voluntarily, which he accepted, obviating the need
for further use of force.  See July 19, 2014 Video Footage #1
(Doc. No. 305-31).  The force team then removed Widi from his
cell without incident.  When removed to a second location,
however, Widi refused to respond to the supervising lieutenant
when asked about the obstruction and whether he would submit to
a visual search.  Additionally, he remained silent when asked
questions by medical staff attempting to assess the state of
Widi's physical and mental health.  Id.

The force team responded to Widi's silence by performing a
full-body search in a third location that appears in the video
footage to be an empty cell, not a shower area.  Id.  In a sworn
declaration, the supervising lieutenant explains that because
"Widi had been hidden from the view of BOP personnel for a
significant period of time while his window was obstructed, a
full body visual search was warranted to ensure that [Widi] had
not harmed himself or fashioned a weapon with which he may
attempt to harm other inmates or BOP staff."  McCoy Decl. (Doc.
No. 305-13) ¶ 2; see also McCoy July 19, 2014 Mem. (Doc. No.

305-17).  The video footage shows that, after officers stripped
Widi's clothes and searched him for weapons, medical personnel
inspected his body and noted minor abrasions on Widi's lower
leg.  July 19, 2014 Video Footage (Doc. No. 305-31).  The force
team then spent several minutes carefully placing Widi in soft
ambulatory restraints.  Id.

Throughout this process, officers restricted Widi's
movement by holding down his torso and individual appendages in
a controlled manner.  Widi, at time, expressed some momentary
discomfort, but otherwise showed no signs of harm.  At the
conclusion of the video, the supervising lieutenant checked the
arm and leg restraints and stated for the video record that they
were perfectly applied and secured.  Id.; see also McCoy July
19, 2014 Mem. re: Unsecured Restraints (Doc. No. 305-18).

**D.  Claim 3: July 19, 2014 calculated use of force in
response to soft restraints becoming unsecure**

Later that day, Widi reported that one of his soft
restraints was not secure.  Widi alleges that the restraints had
not been properly secured by the staff.  Am. Compl. (Doc. No.
226) ¶¶ 210-12.  The officer who reported the problem to the
supervising lieutenant maintained that Widi had tampered with
the restraints and freed himself.  McCoy Decl. (Doc. No. 305-13)
¶ 3 (describing the officer's report to her about the
restraints); McCoy July 19, 2014 Mem. re: Unsecured Restraints

10

(Doc. No. 305-18).  (There is no video footage capturing how Widi's restraints became unsecure.)  In response to Widi's suspected tampering, BOP supervisors authorized and assembled a calculated-use-of-force team to place Widi in more restrictive restraints.  Am. Compl. (Doc. No. 226) ¶¶ 210-12.

Widi alleges that, in reapplying the restraints, officers pulled and twisted the original restraints, pushed him onto the bed, held his head, and held him down with their protective-gear-clad bodies, causing bruises, abrasions, pain, and discomfort.  Id. ¶¶ 211-12.  He further states that the new metal "black boxed" and "Martin-chained" restraints further restricted his movement, interfered with his blood circulation, and caused pain and discomfort.  Id. ¶¶ 214.  According to Widi, such "hard restraints are not to be used unless the inmate has a history of defeating soft ambulatory restraints."  Id.

Video footage submitted by the United States captures the entire incident.  July 19, 2014 Video Footage #2 (Doc. No. 305-47).  At the beginning of the video, the supervising lieutenant acknowledges that Warden Tatum had authorized the use of a force team to apply hard restraints due to Widi's (perceived) disruptive behavior.  Id.  Officers then moved to Widi's cell and encouraged him to comply with the application of hard restraints to avoid unnecessary injuries.  Id.  Though Widi initially agreed, he resisted officers as they attempted to

remove his soft restraints.  In response, members of the force
team used firmer holds to completely restrict the movement of
Widi's arms and legs.  At several times, Widi complained of the
position and force applied to his shins and ankles, prompting
the officers to occasionally change the position or forcefulness
of their holds.  Id.  After the force team applied the hard
restraints, medical personnel assessed Widi's condition.  The
examining nurse noted a "small superficial abrasion to left
mandible with scant amount of bleeding, healing abrasions to the
left knee and scabbed areas to right foot and ankle unchanged."
July 19, 2014, Medical Assessments (Doc. Nos. 305-40, -41, -42).
During a review of Widi's condition hours later, medical staff
further confirmed that Widi's restraints did not require
adjustment.  Id.

> **E.   Claim 4: July 19, 2014 calculated use of force in
> response to removal of the Martin chain and hard
> restraints**

After officers had applied the hard restraints, Widi
"slipped the Martin chain," thereby loosening his hard
restraints.  Am. Compl. (Doc. No. 226) ¶¶ 217, 226.  Widi
alleges that the officers had wrongly re-applied the restraints
because he was not violent or displaying signs of imminent
violence.  Id.  He also alleges that they had re-applied the
restraints too tightly.  Id.

BOP log notes show that an officer checked on Widi every
15 minutes after he was placed in hard restraints earlier in the
afternoon.  July 19, 2014 Restraint Checks (Doc. No. 305-19);
15-minute Check Form (Doc. No. 305-20).  About 1.5 hours after
hard restraints were applied, an officer denied Widi's request
to have the restraints removed.  Id.  Widi then refused his
evening meal, covered his cell window, and hit the duress button
in his cell.  Id.  By 7:30 p.m., he had freed himself from the
Martin chain.  Id.

In response, the Warden again reportedly approved and
assembled a calculated-use-of-force team to re-secure the
restraints.  Myers July 19, 2014 Mem. (Doc. No. 205-65).[2]  In
accordance with BOP policy, officers took video footage of the
interaction.  July 19, 2014 Video Footage #3 (Doc. No. 305-9).
In the footage, it appears that the force team began by
utilizing confrontation avoidance procedures, and that Widi
complied with orders to place the loose end of the Martin chain
attached to his person outside the food tray slot.  See also
Myers July 19, 2014 Mem. (Doc. No. 205-65).  Even when viewing
the video footage in the light most favorable to Widi, the

---

[2] In submitting its filing electronically, the United States
mislabeled certain exhibits, including Myers's June 19, 2014
memorandum.  The mislabeling appears to have been inadvertent.
This order cites to the exhibit numbers provided by the court's
electronic filing system for the sake of clarity.

footage does not show that the force team aggressively or
forcefully handled Widi.

After the force team secured Widi's restraints, Widi was
medically assessed.  Medical records for an exam performed
shortly prior to the incident indicate that staff were able to
place a finger under Widi's cuffs, and that the area had good
color, sensation, and skin temperature.  July 19, 2014 Health
Services Restraint Review (Doc. No. 305-43).  The records also
state that after the incident, Widi's extremities were in stable
neurovascular condition and that the reapplication of the Martin
chain resulted in no new injuries.  Id.

**F.    Claim 5: August 20, 2014 immediate use of force in
        response to obstruction of cell window and food tray
        slot**

On August 20, 2014, Widi covered his cell window and then
placed a mattress in front of his cell's food tray slot when an
officer opened it to check on his condition.  See Am. Compl.
(Doc. No. 226) ¶¶ 223-24.  Widi alleges that on that day, an
officer had served him a false incident report and that a second
officer had initiated disciplinary proceedings against Widi for
covering his cell window.  He further alleges that officers then
gathered chemical agents and a force team to fire chemical
agents into Widi's cell through the food tray slot without first
attempting confrontation avoidance procedures.  Id.

According to Widi, he "was able initially to block most of
the spraying," but was defeated when two officers jabbed,
prodded, and pushed him out from behind the mattress "so that
they could douse him down with the chemical agent." Id.
Officers also allegedly struck Widi's thighs, groin, and
buttocks repeatedly until he grabbed the broom handle and broke
it in two. Id. It is undisputed that Widi barricaded his door
with a mattress and that officers pushed a broom handle into his
cell through the food tray slot on his cell door. Widi argues
the use of force was unnecessary and excessive because he did
not become violent or display signs of violence, was locked in a
SHU cell alone, and did not pose a danger to anyone. Id.
¶¶ 608.

The surveillance video footage (no audio) shows that, at
approximately 2:25 p.m., an officer discovered that Widi had
covered his cell window, thereby blocking his person and his
cell's interior from observation. Aug. 20, 2014 Video Footage
#1 (Doc. No. 305-50). Though the surveillance tape lacks sound,
it appears that the officer called out to Widi through the door.
The footage then shows that the officer knocked on Widi's cell
while waiting for backup. About 3.5 minutes later, the
supervising lieutenant arrived and issued orders to Widi to
remove the obstruction or verbally respond. Id.; see also Hess
Aug. 20, 2014 Mem. (Doc. No. 305-49). Widi reportedly did

15

neither. Hess Aug. 20, 2014 Mem. (Doc. No. 305-49). An officer
then attempted to view inside the cell through the food tray
slot but presumably was prevented from doing so by the mattress
Widi concedes he placed in front of the food tray slot. Aug.
20, 2014 Video Footage (Doc. No. 305-50).

According to the memorandum prepared by Lt. Hess, who was
the supervising lieutenant for the incident, Hess recalled in
that moment that Widi had attempted to commit suicide four weeks
earlier. Hess Aug. 20, 2014 Mem. (Doc. No. 305-49). Hess thus
considered the situation to be an emergency and ordered staff to
utilize a broomstick to maneuver the mattress and regain sight
on Widi. Id.; see also Aug. 20, 2014 Video Footage #2 (Doc. No.
350-53) (memorializing justification for immediate use-of-force
and officers involved after the incident).

The surveillance video footage confirms that officers
attempted to maneuver the mattress with the broomstick, and that
Widi resisted, resulting in an officer being knocked to the
floor and the broom handle breaking in half. Aug. 20, 2014
Video Footage #1 (Doc. No. 305-50). Widi then kept a broken
piece of the broom handle in the cell and did not surrender the
weapon.[3]  Id.  After about eight minutes, the officers infused

---

[3] In his complaint, Widi alleges that one officer later
initiated disciplinary proceedings by falsely accusing Widi of
attempting to stab the officer with the broken broom handle.
According to Widi, the incident report underlying the
disciplinary proceeding was expunged as the video of the

pepper spray into the cell, first in a mist, and then by launching a pepper ball which burst upon contact.  Id.; see also Hess Aug. 20, 2014 Mem. (Doc. No. 305-49).  Afterwards, Widi passed his hands through the slot for cuffing so he could be removed from the pepper-spray-affected cell.  Officers then escorted Widi to the shower.  Aug. 20, 2014 Video Footage #2 (Doc. No. 350-53); see also Hess Aug. 20, 2014 Mem. (Doc. No. 305-49).

### G.   Claim 6: August 20, 2014 immediate use of force during decontamination in shower area

After the above incident, officers escorted Widi to the showers to remove the chemical agents used.  See Am. Compl. (Doc. No. 226) ¶¶ 227.  Widi alleges that the officers placed him under the shower but did not remove his chemical-affected clothing, "thereby preventing him from being decontaminated." Id.  The officers then allegedly placed Widi against a wall, pushing his nose into the wall from behind, "cut off [his] clothing and he experienced humiliation and embarrassment at being disrobed in a public setting."  Id.

Widi also states that an officer placed gloves contaminated with chemical agents on Widi's face and poked Widi's eye,

incident showed the allegations were false.  The United States does not rely on the testimony of that officer to support its summary judgment defense.  Regardless, the court at summary judgment defers to the uncontroverted video footage of the incident, drawing all reasonable inferences from that footage in Widi's favor.

causing pain.  According to Widi, he "tried to shake his head to get" the officer's fingers out of his eyes, at which point the team forced him to the floor, causing him to bite his tongue and strike his knee on the floor.  Id.  Widi alleges that, in the struggle, he suffered pain from the officers pulling on his restraints, as well as "contusions, lacerations and abrasions." Id.

The video footage documenting the incident supplements and, at times, contradicts Widi's unsworn allegations.  The footage shows that Widi, while in the shower, began to complain and to move independently while officers tried to hold him still.  Aug. 20, 2014 Video Footage #2 (Doc. No. 350-53).  The officers then removed Widi from the shower and placed him against a wall to remove his contaminated clothes.  Widi began to resist and push away from the restraining officers when medical staff attempted to do a medical assessment.  Officers insisted that Widi remain in compliance, but Widi forcefully pushed back against them while yelling: "you guys tried to assault me . . . [f**king] stab me."  Id.

In response, officers threw Widi to the ground and piled on him to control his arms, legs, and head.  One officer appeared to have used a headlock temporarily.  When Widi calmed down, the officers applied restraints and slowly returned him to the wall. He soon began resisting again.  Id.  In that struggle, an

18

officer who was controlling the back of Widi's head momentarily touched Widi's face with a contaminated glove.  Id.  After Widi again became calm, officers held him still and completed the stripping of his contaminated clothing so that a medical provider could examine him.  The medical provider found that though Widi had bitten his tongue during the incident, Widi experienced no other significant physical injuries.  Bunnell August 20, 2014 Injury Assessment (Doc. No. 305–61).  Officers then escorted Widi to a holding cell to apply further restraints before reattempting decontamination.

### H.   Claim 7: August 20, 2014 calculated use of force to restrain Widi after decontamination

Later that day, a calculated-use-of-force team assembled to move Widi from the holding cell and place him in different restraints.  Widi alleges that, after voluntarily submitting to hand restraints during confrontation avoidance procedures, the force team members "handled" him "aggressively" and used their protective pads to harm him.  Am. Compl. (Doc. No. 226) ¶ 231. According to Widi, the team "maliciously and sadistically" applied the restraints causing pain, lacerations, contusions, and abrasions.  Id.  Additionally, he alleges, the use of restraints was inappropriate because, he "had not displayed imminent signs of violence" and because he "did not have a

history of defeating the hard restraints and the black-box was
not approved restraint equipment." Id.

The video footage from this incident does not suggest that
the officers acted in an excessively aggressive manner towards
Widi. August 20, 2014 Video Footage #3 (Doc. no. 305-68). The
footage shows that, after the officers removed Widi from his
cell, they scanned him with a metal detector, escorted him to
the shower area, removed his remaining clothing, and conducted a
visual search. Id. Officers then placed Widi in a suicide
smock, applied hard ambulatory restraints, conducted a brief
medical check, and placed him in a cell. Id. On at least one
occasion, Widi complained that an officer was holding his arm at
a "weird angle." Id. During the medical check, the nurse asked
officers to loosen some of the restraints, which they did. Id.
The nurse found good distal circulation and sensation and normal
skin color. The nurse also noted an earlier tongue bite and
minor abrasions that did not require further assessment. Id.

BOP records state that Widi remained in restraints from
about 5:00 p.m. until 5:00 a.m. the next morning. See Aug. 20,
2014 Fifteen Minute Check Form (Doc. No. 305-5); Two-Hour Lt.
Restraints Check Form (Doc. No. 305-64). The fifteen-minute
check log and medical examination records note that Widi was
agitated around 7:00 p.m. to 8:00 p.m. See Aug. 20, 2014
Fifteen Minute Check Form (Doc. No. 305-5); Bunnell August 20,

2014 Injury Assessment (Doc. No. 305-61).  By 10:15 p.m. the
lieutenant approved the progressive removal of restraints,
starting with the leg restraints.  Two-Hour Lt. Restraints Check
Form (Doc. No. 305-64).  All restraints were removed by the
following morning.  Id.

    **I.   Supervision-based claims**

Widi also asserts in his complaint that the supervisory
personnel at FCI-Berlin failed to properly train, supervise, and
discipline the officers involved in each of the incidents
described above.  Am. Compl. (Doc. No. 226) ¶¶ 503, 504, 528,
529, 554, 555, 586, 587, 613, 614, 638, 639, 668, 669.  In May
2018, the United States and 79 now-dismissed Bivens defendants
moved to dismiss all of Widi's supervisory claims arising from
BOP supervisors' after-action reviews and authorizations of
calculated uses of force.  Defs.' Mot. to Dismiss (Doc. No.
287).  In doing so, however, the defendants "inadvertently
failed" to address claims "arising from a failure to supervise
and train officers in advance of the immediate uses of force on
July 18 and August 20, 2014."  Def.'s Mot. for Summ. J. Mem.
(Doc. No. 305-1, at 32).

In March 2019, this court dismissed the former set of
claims because the supervisors' judgments and decisions in
authorizing and reviewing calculated uses of force fell within
the FTCA's discretionary function exception.  Doc. No. 290 at 4.

As such, Widi's claims that supervisors failed to train or oversee officers in advance of the immediate uses of force remain live in this case.

### J.   **Widi's motions to extend summary judgment response deadline**

On February 24, 2020, the United States filed and served the instant motion for summary judgment via the court's electronic filing system.  Doc. No. 305.  This filing included a complete index of every exhibit cited in the United States's memorandum.  As noted more recently by Widi, this filing did not include a certificate of service stating that the United States sent Widi copies of the conventionally filed exhibits that could not be filed electronically.  Id.; see also Widi Mot. to Strike (Doc. No. 314) (filed in August 2020).

Under Local Rule 7.1, Widi's response was due within 30 days of February 24 – specifically March 26, 2020.  Widi did not respond by that date.  On April 6, 2020, this court sua sponte extended the summary judgment response deadline to May 4, 2020 and directed the clerk's office to send Widi a copy of the notice regarding summary judgment that it sends to pro se litigants.  On May 4, Widi moved for an extension on the grounds that he had been ill for over a month, believing it to be COVID-19.  Doc. No. 308.  The next day, the United States assented to, and the court granted, the requested relief, extending the

response deadline to May 18, 2020.  May 5, 2020 Endorsed Order
Granting Motion to Extend.

On May 18 and again on June 23, 2020, Widi filed a second
and then a third motion for an extension on the grounds that
COVID-19 closures in his area affected his ability to conduct
necessary legal research.  Doc. Nos. 310 & 312.  Each time, the
court swiftly granted Widi's motions, giving him an additional
30 days to respond to the United States's motion for summary
judgment.  May 19 and June 23, 2020 Endorsed Orders Granting
Motion to Extend.  Upon granting the third request, however, the
court cautioned that it would "not grant further extensions
except upon a showing of good cause made in a timely motion."
June 23, 2020 Endorsed Order Granting Motion to Extend.

On July 7, 2020, Widi notified the court for the first time
that he could not complete his summary judgment response because
the United States had failed to provide him copies of
conventionally filed exhibits.  Doc. No. 313, at 1.  Widi also
represented that he was not able to use alternative sources
because BOP staff had seized the videos when initially produced
in discovery and had refused to return those videos to Widi upon
completion of his sentence.  Id. at 2.  Widi therefore requested
a fourth 30-day extension of the deadline.  Id.  The United
States assented to the extension on the conditions that (1) it
would provide Widi with another copy of these exhibits and

23

(2) this would be the last extension Widi would request in
regard to objecting to summary judgment.  Id. at 2.  The court
granted a 30-day extension, emphasizing that "[n]o further
extensions of that deadline w[ould] be granted except upon good
cause shown."  July 16, 2020 Endorsed Order Granting Partially
Assented to Motion to Extend.

Instead of filing a response, Widi filed a motion to strike
the United States's motion for summary judgment on August 6,
2020.  Doc. No. 314.  Therein, Widi declared under penalty of
perjury that he never received the conventionally filed videos,
and that the United States had provided him access to these
files through USAfx, a cloud-based file storage and sharing
platform.  Widi Decl. (Doc. No. 314-1) ¶ 1.  According to Widi,
the cloud folder only contained videos from the August 20 use-
of-force incident, those videos did not have sound, and there
was "no readily identifiable way of ascertaining whether those
videos match[ed] the exhibits" actually submitted to the court.
Id. ¶¶ 2-3.  Additionally, he accused the United States of
materially breaching its discovery obligations.  Id. ¶ 4.  The
motion did not include a certification declaring that Widi had
sought the United States's consent for the relief sought, or
that he had informed the United States of his technical
difficulties, before seeking to strike.

24

### K.    Recent attempts to send Widi copies of incident video footage through physical media

On August 20, 2020, the United Stated filed its first motion to extend the summary judgment response deadline.  Doc. No. 315.  Therein, the United States asserted that it "was unaware that Mr. Widi had experienced difficulties with USAfx until he sought to strike the motion for summary judgment."  Id. ¶ 2.  In its view, "[t]he interests of justice [would] not be served by diverting the focus of this case into resolution [sic] the controversy about what Mr. Widi did or did not receive." Id. ¶ 3.  It thus proposed, "in the interest of clarity and finality," an altered briefing schedule.  Id.  The court granted this request, in part, as follows:

> By Aug. 28, 2020, the United States must overnight to plaintiff an electronic copy of each of the conventionally filed exhibits to Doc. No. 305 on a DVD or thumb drive, and the United States must simultaneously file a certificate of service identifying each file or document served, the manner of service, and the date of service.
>
> Mr. Widi must contact counsel for the United States and file a notice in this case by September 4, 2020, executed under penalty of perjury, see 28 U.S.C. § 1746, stating when he received the documents or media at issue, and stating whether he encountered any difficulty accessing any of the files sent to him.
>
> Mr. Widi's objection to the summary judgment motion is due on September 14, 2020; no extensions of that deadline will be granted except upon a motion filed by that date, showing good cause.
>
> The United States is granted until September 8, 2020 to file an objection to the motion to strike.

August 26, 2020 Endorsed Order Granting in Part and Denying in
Part Motion to Extend (formatting altered).

In accordance with this order, the United States filed a
certificate of service certifying that on August 27, 2020, it
had mailed via Federal Express overnight mail an encrypted thumb
drive containing electronic copies of specifically identified
conventionally filed exhibits to Widi's address of record.  Doc.
No. 316.  For each video, the certificate also listed the number
of parts the video contained and whether or not the video
included sound.  Id.  Pursuant to DOJ policy, the United States
sent the password to access the thumb drive to Widi's email
address of record.  See id. n.1.

On Friday, September 4, 2020, Widi notified the court that
the United States had sent him "a chip card" instead of a DVD or
thumb drive, which prevented him from ascertaining whether the
United States had supplied the exhibits at issue.  Doc. No. 317.
The next business day, the United States filed its objection to
the motion to strike.  Doc. No. 318.  In that objection, the
United States asserted that the "chip card" of which Widi
complained was in fact a USB thumb drive.  Id. at 4.  It also
noted that minutes after Widi filed his late-Friday notice, he
emailed the United States Attorney's Office employee who had
sent him the password to the encrypted drive for help on how to
access the drive.  Id.  According to the United States, the USAO

employee responded to Widi's email the next day and informed Widi how to find, via an online search, instructions for the USB drive.  The USAO employee also sent a link to an instructional video.  Id.

On September 11, 2020, the court conducted a telephone conference concerning Widi's motion to strike.  During that call, the United States agreed to arrange for Widi to access the video footage at issue at the United States Attorney's Office in New Jersey, if Widi so requested.  Shortly thereafter, a USAO paralegal sent Widi two emails offering assistance.  United States's Notice of Attempts to Provide Summ. J. Exhs. (Doc. No. 319-1).  The first email offered Widi the opportunity to participate in a conference call with an information technology specialist to walk him through the process of opening the drive and accessing the documents.  The second email gave Widi specific directions for activating the executable file on the previously delivered USB drive.  Widi responded to neither email, despite the paralegal's written instructions to do so. Id.  The paralegal also attempted to contact Widi by telephone but was unsuccessful and was unable to leave a message.  Id.

Since the September 11 telephone conference, Widi has filed no additional motions, notices, or responses with the court. Additionally, the United States has not informed the court of any attempts by Widi to contact its office regarding attempts to

access video footage exhibits central to the United States's
motion for summary judgment.  The court thus reviews the United
States's unopposed motion for summary judgment on the undisputed
record currently before it, which includes conventionally filed
video footage (most clips with sound) documenting each use-of-
force incident described in Widi's unverified complaint.

## II.  **Applicable legal standard**

Summary judgment is appropriate when the moving party shows
that "there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).  A genuine dispute is "one that must be decided
at trial because the evidence, viewed in the light most
flattering to the nonmovant, would permit a rational factfinder
to resolve the issue in favor of either party." Baum-Holland v.
Hilton El Con Mgmt., LLC, 964 F.3d 77, 87 (1st Cir. 2020)
(quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5,
8 (1st Cir. 1990)).  "Facts are material when they have the
potential to affect the outcome of the suit under the applicable
law." Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23
(1st Cir. 2017)).

"The party moving for summary judgment bears the initial
burden of showing that no genuine issue of material fact
exists." Feliciano-Munoz v. Rebarber-Ocasio, 970 F.3d 53, 62
(1st Cir. 2020) (internal citation omitted).  Then, "[the

nonmoving party] must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which [it] has the burden of proof." Id. (quoting Prado Álvarez v. R.J. Reynolds Tobacco Co., 405 F.3d 36, 39 (1st Cir. 2005)) (alteration in original). In doing so, the non-movant "cannot rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020) (quoting Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)).

When ruling on such a motion, the district court must "constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). The Supreme Court has explained, however, that such a lens is required only if facts are genuinely in dispute. See id. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Additionally, if the events in question are captured on video and there is no genuine question regarding the video footage's authenticity or admissibility, the court must "view[] the facts

in the light depicted by the videotape." Id.; see also McMullin
v. Peirson, No. 1:17-CV-312-LEW, 2019 WL 237382, at *1, 2019
U.S. Dist. LEXIS 7533, at *1 (D. Me. Jan. 16, 2019); Mitchell v.
Miller, 56 F. Supp. 3d 57, 61 (D. Me. 2014), aff'd, 790 F.3d 73
(1st Cir. 2015).

Such is the case here regarding whether BOP officers' use
of force was in fact excessive given the circumstances.  To
date, Widi has produced no evidence — not even a sworn
declaration — disputing the United States's heavily evidenced
rendition of the material facts.  The court therefore rejects
Widi's version of events to the extent they are directly
contradicted by the video footage capturing each incident, and
instead defers to the facts as depicted in the video footage to
determine whether there are genuine disputes of material fact as
to Widi's claims or the United States's justification defense.

## III. **Analysis**

The United States contends that it is entitled to summary
judgment on two grounds.  First, it argues that it is not liable
under the FTCA for the force used by BOP officers because the
force used, as evidenced by the undisputed factual record, was
reasonable and justified under applicable law.  Second, it
asserts that it is not liable for BOP supervisors' purported
failure to train, supervise, or discipline BOP officers because
the BOP's decisions regarding training and supervision are

protected by the discretionary function exception to the FTCA.
Widi has submitted no objection or response to these arguments.
The court addresses each argued ground in turn.

### A.   FTCA claims based on officers' use of force

In the first of his two remaining sets of claims, Widi
contends that the United States is liable under the FTCA for the
intentional tortious conduct of its employees in subjecting him
to force and misapplying restraints during seven incidents in
2014 — each incident constituting a separate FTCA claim.

"The FTCA permits suits against the [federal] government
for torts caused by the wrongful acts of any government employee
while acting within the scope of his office or employment."
Dominguez v. United States, 799 F.3d 151, 153 (1st Cir. 2015)
(citing 28 U.S.C. § 1346(b)(1)); see also 28 U.S.C. § 2674.  In
addressing an FTCA action, federal district courts must apply
the law of the state in which the alleged tortious conduct
occurred, which, in this case, is New Hampshire.  28 U.S.C.
§ 1346(b).  Where FTCA clams concern allegations of intentional,
excessive force by correction officers, federal courts in the
District of New Hampshire and elsewhere typically apply the
state law of battery.  See, e.g., Martinez v. United States, No.
14-cv-231-LM, 2016 U.S. Dist. LEXIS 36973, at *18-19 (D.N.H.
Jan. 15, 2016), R&R adopted, 2016 U.S. Dist. LEXIS 36944 (D.N.H.
Mar. 22, 2016), aff'd, No. 16-1368 (1st Cir. Oct. 17, 2018).

In New Hampshire, "[a] defendant may be held liable for battery if '(a) he [or she] acts intending to cause a harmful or offensive contact with the person of the other or a third person, or imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.'" Martinez, 2016 U.S. Dist. LEXIS 36973, at *19 (citing Rand v. Town of Exeter, 976 F. Supp. 2d 65, 75-76 (D.N.H. 2013); United Nat. Ins. Co. v. Penuche's, Inc., 128 F.3d 28, 32 (1st Cir. 1997); Restatement (Second) of Torts § 13 (1977)). However, "[n]o person shall incur any civil liability to another person by taking action against such person which would constitute justification pursuant to [N.H. Rev. Stat. § 627]." N.H. Rev. Stat. § 507:8(d).

Under N.H. Rev. Stat. § 627, "justifiable conduct shall constitute a complete defense to any civil action based on such conduct." Id. § 627:1; see also id. §§ 627:2 to 627:8 (identifying seven examples of justifiable conduct). Such conduct includes the use of "non-deadly force upon another person in order to defend himself or a third person from what he [or she] reasonably believes to be the imminent use of unlawful, non-deadly force by such other person," so long as degree of

force used is that which the person reasonably believes to be necessary for self-defense.[4]  Id. § 627:4, I.  Additionally:

> [a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect . . . [a] detention . . . unless he knows that the . . . detention is illegal . . . .

Id. § 627:5, I.  Both the New Hampshire Supreme Court and this court have found that the term "law enforcement officer," as used in chapters 625 to 651 of the New Hampshire Code, includes prison officials.  See Martinez, 2016 U.S. Dist. LEXIS 36973, at *20-21 (finding that a prison guard's actions were justified under § 627:5, I); cf. State v. Tallard, 143 N.H. 228, 230, 723 A.2d 574, 575 (N.H. 1998) (construing the general meaning of "law enforcement officer" as "including individuals who exercise the police power to preserve peace and order, whether they be state or local police officers, sheriffs, or correctional officers" for purposes of understanding N.H. Rev. Stat. § 651:6).  But see Hall v. Powell, No. 92-cv-141-JD, 1994 WL 421108, at *6 (D.N.H. Aug. 11, 1994) (expressing doubt, in dicta, as to whether the law enforcement exception applied in post-incarceration situations).

---

[4] Such force is not justifiable, however, if the person provoked "the use of unlawful non-deadly force" by another with "a purpose to cause physical harm" or if the person "was the initial aggressor."  Id. § 627:4, I(a)-(b).

The United States contends that in each incident identified
by Widi, BOP officers' use of force was legally justified, as
demonstrated by the undisputed factual record.  The court has
reviewed the record for each incident and agrees that no
reasonable trier of fact viewing the undisputed factual record
in the light most favorable to Widi could find in Widi's favor
on any of his claims.  Accordingly, the court grants the United
States's motion for summary judgment in its entirety.

### 1.   Immediate use of force for refusal to comply with escort to the SHU (Claim 1)

Widi alleges that on July 18, 2014, BOP officers subjected
him to an immediate use of force for refusing a hostile cell
environment, and maliciously and sadistically applied restraints
to Widi to harm and punish him.  Am. Compl. (Doc. No. 226)
¶¶ 511-512.  Additionally, Widi suggests in his allegations that
he did not become violent or display signs of imminent violence.
Id. ¶ 510.  As noted above, however, the video surveillance
footage of this incident directly undermines Widi's allegations
of malicious, tortious conduct.

The undisputed video footage shows that, despite Widi's
assertions that he was not violent, he physically refused to
enter his cell and pushed back against the escorting officers,
instigating the use-of-force incident.  Under these
circumstances, it would be reasonable for BOP officers to
perceive Widi's conduct as an immediate, serious threat to BOP

34

staff, institution security, and good order.  BOP policy
therefore authorized the officers to use immediate, rather than
calculated, force, to subdue Widi and regain control over his
person.  The video footage further shows that the officers
reasonably tailored their immediate-use-of-force response to
Widi's resistance.  To the extent Widi suffered any injuries
despite his statement that he was "fine," such injuries were
caused by a reasonable level of force used in response to Widi's
physical non-compliance with officers' orders.

Even when viewed in the light most favorable to Widi,
nothing in the video footage or any other evidence of record
tends to show an excessive or unreasonable use of force by any
BOP official in subduing Widi or applying restraints, given the
actions taken by Widi.  Under the circumstances, the use of
force against Widi for refusing his housing assignment was
justified under New Hampshire law.  The motion is properly
granted to the extent it targets Claim 1.

### 2. Calculated use of force in response to obstruction in Widi's cell window (Claim 2)

For his second claim, Widi alleges that on July 19, 2014,
BOP officers tortiously executed a calculated use of force
against him based on the false allegation that Widi had covered
his cell window.  According to Widi, he voluntarily submitted to
hand restraints when approached by the force team to avoid
confrontation before being forcibly stripped of his clothing in

a shower area.  Widi contends that these actions violated BOP
policies, specifically PS 5270.09, which establishes a
disciplinary process that provides for sanctions against inmates
who refuse a direct order, as well as PS 5566.06, which permits
the use of force only as a last resort for when an inmate
becomes violent or displays signs of imminent violence.  Am.
Compl. (Doc. No. 226) ¶¶ 534-45.  Widi is mistaken.

Video footage of the incident and contemporaneously drafted
memoranda from that day contradict the key elements of Widi's
rendition of events.  First, the video footage clearly shows
that there was in fact an obstruction in Widi's cell window.
And though Widi voluntarily submitted to hand restraints, he
subsequently chose to ignore health and safety questions posed
by the medical examiner and the supervising officer, prompting
the forcible strip search.  BOP memoranda documenting the use-
of-force incident explain why, in this specific circumstance,
the strip search was reasonable, not excessive:  In short, the
supervising lieutenant determined that, because "Widi had been
hidden from the view of BOP personnel for a significant period
of time while his window was obstructed, . . . a full body
visual search was warranted to ensure that [he] had not harmed
himself or fashioned a weapon with which he may attempt to harm
other inmates or BOP staff."  McCoy Decl. (Doc. No. 305-13) ¶ 2.

Additionally, the force used during this incident did not
violate BOP policy, despite Widi's assertions to the contrary.
PS 5270.09 – which generally outlines the BOP inmate discipline
program for imposing sanctions such as segregation or fines
after an inmate commits prohibited acts – does not prohibit
officers from using force to stop prohibited acts that threaten
prison security or order.  See PS 5270.09 at 1.  Widi points to
no provisions therein that specifically prohibit BOP officers
from using force.  Indeed, the only time the policy mentions the
use of force is in the context of what details an officer must
include in his or her incident report, which then initiates
after-the-fact inmate disciplinary proceedings.  Id. at 17.

Additionally, PS 5566.06 – which directly concerns the use
of force – does not restrict the use of force to a last resort
for when an inmate becomes violent or displays signs of imminent
violence.  Rather, staff may use force "as a last alternative
after all other reasonable efforts to resolve a situation have
failed."  PS 5566.06 at 1.  The policy also makes clear that BOP
staff may use force "when attempts to gain voluntary cooperation
form the inmate have not been successful."  PS 5566.06 at 2.
Such was the case here, when Widi refused to answer health and
safety questions posed by officers and medical staff.

Based on the video footage, contemporaneously filed
memoranda, and sworn testimony submitted, there is no doubt that

BOP officers were reasonably justified in using force to regain control over Widi and ensure he had not harmed himself or posed a threat to BOP inmates or staff.  Additionally, there is no evidence that BOP officers intentionally attempted to inflict injury on Widi in the process.  The United States is therefore entitled to judgment as a matter of law on the FTCA claim concerning this incident (Claim 2).

### 3.   Calculated use of force in response to soft restraints becoming unsecure (Claim 3)

For his third claim, Widi argues that BOP officers' application of hard restraints was excessive and unreasonable because officers knew or should have known that he had not manipulated his restraints, he was not displaying signs of violence or resistance, and he was physically injured during the process.  Widi contends in his complaint "that these actions violated a BOP policy providing that hard restraints are not to be used unless the inmate has a history of defeating soft ambulatory restraints."  Am. Compl. (Doc. No. 226) ¶ 214.

The United States disagrees, noting that BOP policy – specifically PS 5566.06 – gives discretion to BOP officers to apply soft or hard restraints when "the inmate's behavior becomes increasingly aggressive and disruptive,"  PS 5566.06 at 11, and that, under that policy, hard restraints may be used "after soft restraints have proven ineffective, or a past history of ineffectiveness exists," regardless of whether an

inmate has a history of defeating soft restraints, id. at 8.  It
thus contends that staff's decision to substitute hard
restraints was not unreasonable under BOP policy, as "less than
one hour into a restraint detention designed as a 'cool down'
measure following a protected period of belligerent and
combative conduct, a soft restraint was found unsecured."
Def.'s Mot. for Summ. J. Mem. (Doc. No. 305-1, at 28).

Though video footage documents BOP officers' calculated use
of force in applying hard restraints, no footage or admissible
testimony directly confirms that Widi manipulated his restraints
or that there otherwise was a "past history of ineffectiveness"
with respect to soft restraints.  Nevertheless, the record does
contain evidence which, viewed together, supports such an
inference.  First, the video footage capturing the officers'
initial attempts to secure Widi in soft restraints shows that,
after BOP officers took their time to apply the restraints,
Lt. McCoy personally inspected the restraints and declared them
properly applied.  Aug. 20, 2014 Video Footage #2 (Doc. No. 350-
53); see also McCoy Decl. (Doc. No. 305-13) ¶ 3 (swearing, based
on her personal observations, that the soft restraints were
properly applied).  Second, McCoy states in her declaration
that, prior to authorizing the use of hard restraints, the
"staff performing fifteen-minute restraints checks on Widi"
relayed to her that Widi had manipulated his soft restraints.

McCoy Decl. (Doc. No. 305-13) ¶ 3; McCoy July 19, 2014 Mem. re: Unsecured Restraints (Doc. No. 305-18). This latter statement constitutes hearsay evidence which, without independent corroboration, is insufficient to prove the truth of the matter asserted – specifically that Widi had in fact manipulated his restraints or that his restraints had otherwise "proven ineffective" under PS 5566.06. See Fed. R. Evid. 801 & 802 (setting forth the rule against hearsay). The statement may be considered, however, as evidence of McCoy's state of mind in authorizing the calculated use of force. See Fed. R. Evid. 803 (setting forth permissible exceptions to the hearsay rule).

Widi offers no submission of evidentiary quality to support his assertion that his soft restraints were not properly secured. Nor has he submitted anything of evidentiary quality suggesting that Lt. McCoy had reason to doubt the reports of her subordinates or a further duty to investigate on her own. Based on her personal supervision of the application of Widi's restraints, the report of her subordinates, and her personal interactions with Widi that day, McCoy reasonably viewed the circumstances as justifying the progressive move to hard restraints to regain control over Widi. Thus, even if a genuine dispute of material fact existed as to whether officers had properly secured Widi's restraints earlier that day, no reasonable jury could find that McCoy's decision to apply hard

restraints was unreasonable given the circumstances known to

her.  Additionally, no reasonable jury could view the videotape

documenting Widi's resistance during the incident and find that

BOP officers used disproportionate force in their attempts to

completely restrict the movement of Widi's arms and legs while

applying hard restraints.  The medical records from after the

incident bolster this conclusion, as they further show that,

despite Widi's alleged complaints of pain as a result of the use

of force, he suffered, at worst, minor injuries from the force

used and did not need an adjustment to his restraints.

On this record, BOP staff were indisputably justified in

their decision to use hard restraints, their application

thereof, and the proportional force used to counter Widi's

physical aggression and resistance.  The court thus enters

summary judgment on this claim (Claim 3).

### 4.   Calculated use of force in response to removal of the Martin chain and hard restraints (Claim 4)

For his fourth claim, Widi argues that, after he slipped

his Martin chain, BOP officers wrongly used force to reapply his

hard restraints because the hard restraints used were causing

medical problems and because he was not displaying signs of

violence.  Am. Compl. (Doc. No. 226) ¶¶ 577-82.  Additionally,

he argues that BOP officers re-secured the restraints too

tightly, further exacerbating the harm to his health.  Id.

As discussed above, however, BOP policy does not restrict the use of force to a last resort when an inmate becomes violent or displays signs of imminent violence; rather, it permits the use of hard restraints when an inmate's behavior becomes increasingly aggressive and disruptive, as was the case with Widi here. See PS 5566.06. Widi concedes in his complaint that he deliberately slipped his Martin chain. Am. Compl. (Doc. No. 226) ¶ 217. The video footage of the incident further documents that after Widi surrendered the potential weapon and was restrained by BOP officers, medical staff confirmed that he had suffered no injuries as a result of his hard restraints.

The undisputed evidentiary record shows that BOP officers acted justifiably in assembling a calculated-use-of-force team and re-securing Widi's hard restraints. Summary judgment in favor of the United States is therefore appropriate on this claim (Claim 4).

### 5. Immediate use of force in response to obstruction of cell window and food tray slot (Claim 5)

For his fifth claim, Widi contends that BOP officers' use of chemical agents and physical force on August 20 was excessive and wrongful because he did not display signs of violence and was locked in a SHU cell alone where he did not pose a danger to anyone. Am. Compl. (Doc. No. 226) ¶¶ 607-08. Widi's version of events, however, is directly contradicted by the undisputed video evidence of record.

The surveillance video footage shows that on that day, Widi had covered his cell window, obstructing himself and the interior of his cell from view; a BOP official attempted to communicate with Widi before knocking on the cell; and a BOP lieutenant attempted to see inside Widi's cell through the food tray slot – all of which occurred minutes before chemical agents were deployed.  The video footage also shows that Widi displayed signs of imminent violence to himself and others, which increased throughout the duration of the incident.  For example, when officers first attempted to use a broom stick to knock at the mattress obstructing Widi's food tray slot, Widi pushed back hard against the officers with the broom, knocking an officer to the floor and breaking the broom handle.  Widi also retained part of the broom handle in his cell and did not surrender the weapon, thus increasing the risk of imminent harm to himself and to BOP officers.  It was only after these events that BOP officers infused pepper spray into Widi's cell.

BOP policy clearly establishes that the use of such force, including chemical agents, was not excessive or unreasonable under these circumstances.  Under PS 5566.06:

> The Warden may authorize the use of chemical agents or non-lethal weapons only when the situation is such that the inmate:
>
> a. Is armed and/or barricaded; or,
>
> b. Cannot be approached without danger to self or others; and,

43

> c. It is determined that a delay in bringing the
>    situation under control would constitute a
>    serious hazard to the inmate or others, or
>    would result in a major disturbance or serious
>    property damage.

See also 28 C.F.R. § 552.25 (corresponding regulation).

Here, the situation involving Widi, as documented by the undisputed evidentiary record, cleared all three criteria for the use of chemical agents: Widi was potentially armed with a broomstick and had barricaded himself in his cell, Widi could not be approached without danger to BOP officers, and BOP officers had determined that a delay in bringing the situation under control would constitute a serious hazard to Widi's health, especially in light of a recent suicide attempt. See Hess Aug. 20, 2014 Mem. (Doc. No. 305-49) (documenting incident). As a result, the supervising lieutenant reasonably viewed the circumstances as an emergency and authorized the use of force to regain control over Widi.

There is no genuine dispute of material fact as to whether force used during this incident was excessive. The record indisputably shows that it was reasonable, justified, and in accordance with BOP policy given the emergency circumstances. The court grants the motion for summary judgment in the United States's favor on this claim (Claim 5).

44

### 6.   Immediate use of force during decontamination in shower area (Claim 6)

For his sixth claim, Widi asserts that BOP officers punitively used force against him while he was being decontaminated of chemical agents in the shower area, thereby continuing his suffering from the agent's adverse effects.  Am. Compl. (Doc. No. 226) ¶¶ 631-636.  Widi argues that BOP officers knew or should have known that the failure to properly decontaminate him would cause him harm, and that the immediate use of force was excessive, disproportionate, and avoidable had officers properly decontaminated Widi and his clothing.  Id. ¶ 636.

The undisputed video footage capturing the entire incident undermines Widi's narrative of events.  It shows that Widi, once removed to the shower area, struggled and argued with officers while they tried to hold him still.  BOP officers then responded by placing Widi against a wall, face towards the wall, to forcibly cut off Widi's chemical-agent-contaminated clothes. When medical staff attempted to examine Widi, he pushed away the restraining officers and yelled in anger.  The officers responded to the potential threat by throwing Widi to the ground.

The video footage further shows that the officers attempted to return Widi to the wall after he calmed down, but Widi continued to resist.  And in that struggle, an officer's

45

contaminated glove met Widi's face.  Despite Widi's assertions
to the contrary, nothing in the video suggests that BOP officers
used excessive force or acted with punitive intent.  Though
Widi's antagonism may be explained in some part by the pain of
being exposed to a chemical agent, this does not belie the
documented fact that he displayed physical signs of imminent
violence and repeatedly resisted the officers' attempts to
properly decontaminate him.  Under these circumstances, no
reasonable juror viewing the video footage could find that the
BOP officers used excessive or unreasonable force to restrain
Widi or counter his resistance.  This conclusion is further
buttressed by the findings of the after-incident medical exam,
which only recorded Widi biting his own tongue as an injury.

Viewing the evidence in the light most favorable to Widi,
BOP officers were justified in their use of force as a response
to Widi's aggression, even though the use of force resulted in
one officer touching Widi's face with a contaminated glove.
Additionally, they were justified in their application of leg
restraints.  The court grants the motion for summary judgment in
the United States's favor on this claim (Claim 6).

####    7.    Calculated use of force to restrain Widi after
                decontamination (Claim 7)

For his seventh claim, Widi contends that after the
chemical-agent incidents described above, BOP officers
maliciously and sadistically applied hard restraints, causing

him pain, lacerations, contusions, and abrasions.  Am. Compl.
(Doc. No. 226) ¶¶ 231, 680.  Again, he alleges (erroneously)
that the use of restraints was inappropriate because, he "had
not displayed imminent signs of violence" and the use of hard
restraints was inappropriate because he "did not have a history
of defeating the hard restraints and the black-box was not
approved restraint equipment."  Id.; see also Part III.A.3
(discussing how BOP policy does not require a history of
defeating restraints).

Despite these allegations, the undisputed video footage
from this incident show that the officers acted reasonably in
applying restraints to Widi.  This footage shows that after the
disruptive and aggressive events described in Claims 5 and 6:
BOP officers placed Widi in a suicide smock and hard ambulatory
restraints; a BOP nurse examined Widi; and Widi's restraints
were loosened at the nurse's request.  Thereafter, Widi was
reported as having good distal circulation, sensation, and skin
color.  In taking these actions, BOP officers abided by BOP
policies authorizing the application of restraints and mandating
medical staff oversight.  See PS 5566.06 at 11.

BOP records for that day further document that officers
checked on Widi every fifteen minutes while he was restrained.
See Aug. 20, 2014 Fifteen Minute Check Form (Doc. No. 305-5);
Two-Hour Lt. Restraints Check Form (Doc. No. 305-64).  Within

hours, a BOP lieutenant approved the progressive removal of Widi's restraints.  Two-Hour Lt. Restraints Check Form (Doc. No. 305-64).  Widi was freed from all restraints by the following morning, in accordance with BOP policy.  Aug. 20, 2014 Fifteen Minute Check Form (Doc. No. 305-5).

In sum, the United States has sufficiently shown, based on the undisputed evidentiary record, that the force used by BOP officers was reasonable and legally justified.  Widi, by comparison, has pointed to no evidence or legal authority that supports his excessive force claim at this procedural stage. Accordingly, summary judgment in the United States's favor is appropriate.

### B.   Supervision-based claims

In his second set of claims, Widi contends that the United States is also liable for BOP supervisors' failure to train, supervise, and discipline the officers in advance of the immediate-use-of-force incidents described above.  Am. Compl. (Doc. No. 226) ¶¶ 503, 504, 613, 614, 638, 639.  The United States argues that these claims should be dismissed because supervisory decisions on the training officers in advance of immediate uses of force fall within the discretionary function exception to the FTCA, which strips this court of jurisdiction to consider Widi's remaining supervisory liability claims.  The

United States is correct that this court lacks jurisdiction over such claims.

The FTCA excepts from its limited waiver of sovereign immunity "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  To determine whether the discretionary function exception applies, courts apply a familiar framework based on two questions, see United States v. Gaubert, 499 U.S. 315, 328 (1991):

> The first question is whether the conduct [that caused the alleged harm] can be called "discretionary." Conduct cannot be called discretionary if a federal "'statute, regulation, or policy' actually dictates 'a course of action'" — because in that scenario, the federal employee "has no choice but to follow the 'directive.'"

> [] The second question (asked only if the conduct involves an element of discretion) is whether "'the exercise or non-exercise of the granted discretion is actually or potentially' affected by" legitimate "policy-related judgments," . . . . [I]mportantly, when a federal statute, regulation, or policy lets a government agent exercise discretion, a court presumes the agent's acts involve policy.

Reyes-Colón v. United States, 974 F.3d 56, 58-59 (1st Cir. 2020) (internal citations omitted) (formatting altered).  "If the answer to each question is yes, the discretionary-function exception applies, and the sovereign-immunity doctrine precludes

suit on the at-issue claims." Id. (citing Mahon v. United States, 742 F.3d 11, 14 (1st Cir. 2014)).

Here, the United States has sufficiently shown that BOP decisions regarding training of officers in advance of immediate uses of force is both discretionary and affected by policy-related judgments.  First, the statute ordering the BOP to provide for the safekeeping, care, . . . subsistence, . . . protection, instruction and discipline of all persons charged with or convicted of offenses against the United States" does not dictate the manner in which BOP must fulfill these supervisory duties.  18 U.S.C. § 4042(a)(1)-(3).  The extent of training, supervision, or disciplinary actions required of BOP officers appears to be entirely at the discretion of BOP managers and the warden.  And the discretion and judgment required in prison circumstances is precisely the reason courts have accorded a high degree of deference to authorities in the means they may use to fulfill these statutory duties.  See, e.g., Montez ex rel. Estate of Hearlson v. United States, 359 F.3d 392, 396 (6th Cir. 2004); Echevarria-de-Pena v. United States, No. 12-22248-CIV, 2013 WL 616932, at *4, 2013 U.S. Dist. LEXIS 22067, at *11-12 (S.D. Fla. Feb. 19, 2013) ("There is no doubt that BOP exercises discretion in how it trains its employees . . . .  This decision is also grounded in considerations of public policy because decisions as to how to

train employees necessarily involve the allocation of BOP's economic resources.").

To date, Widi has not identified a statute, regulation, or policy that precluded or constrained BOP supervisors' judgment in determining whether any particularized training, supervision, or disciplinary action was required in advance of immediate uses of force. Nor has he cited any legal matrix – statute, regulation, or policy – that in fact dictates a prescribed, mandatory, and specific course of conduct that supervisors should have followed but did not abide by. To the contrary, the only BOP policies Widi cites – the BOP regulations and policies concerning inmate disciplinary programs and the use of force – describe required training in very general and discretionary terms.

Under BOP PS 5566.06 (use of force), for example, BOP training must cover, at minimum "communication techniques, cultural diversity, dealing with the mentally ill, confrontation avoidance procedures, the application of restraints (progressive and hard), and reporting procedures." Id. at 23. "The Warden of each institution shall determine how many staff should be trained in confrontation avoidance procedures and forced cell move techniques. At a minimum, these staff shall be trained on an annual basis. . . . Training should also include specific information pertaining to special situations." Id. Whether

51

additional training, supervision, or disciplinary action is required is entirely at the discretion of the warden. See also PS 5270.09 (inmate disciplinary program policy, which does not set forth training requirements for BOP officers who use force).

Although these policies outline some guiding principles and a few minimum requirements, nothing therein divests BOP supervisory personnel of the responsibility to exercise professional judgment in training BOP officers in advance of a use of force or deciding whether training beyond what is minimally required is warranted. "As a matter of common sense, and as a matter of legal presumption, Gaubert, 499 U.S. at 324, the exercise of this discretion is clearly susceptible to fundamental policy-related judgments regarding the safe, secure, and efficient operation of a prison." March 5, 2019 Order Granting Mot. to Dismiss (Doc. No. 290, at 75) (aggregating numerous examples of "inherent and intractable complexity of daily prison operations" and the "often instantaneous and intuitive judgments that must be made in the minute-to-minute management of a volatile and highly restrained inmate population"). Widi's claims based on such supervisory conduct are therefore barred under the discretionary function exception to the FTCA. Because this court lacks subject matter jurisdiction over the claims at issue, it must dismiss the remainder of Widi's supervisor-based liability claims.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the court grants the United States's motion for summary judgment (Doc. No. 305).   Judgment shall be entered accordingly, and the case shall be closed.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

November 30, 2020

cc:  David J. Widi, Jr.
     Frances S. Cohen, Esq.